# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| MILDRED LOUISE GIBSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:04-CV-574 |
| | ) | (Shirley) |
| NATIONAL SEATING COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This is an employment discrimination case. The plaintiff Mildred Gibson brings this action against the defendant National Seating Company ("National Seating"), alleging that she was terminated from her employment in violation of the Tennessee Handicap Discrimination Act, Tenn. Code Ann. § 8-50-103; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*; and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.* The plaintiff also claims retaliatory discharge in violation of the Workers' Compensation Law, Tenn. Code Ann. § 50-6-101 *et seq.*

The defendant moves for summary judgment, arguing (1) that the plaintiff is not disabled, nor does the plaintiff allege that she was discharged solely because of her disability; (2) that the plaintiff cannot establish a prima facie case of age discrimination; and (3) that the plaintiff cannot establish a prima facie case of retaliation under the Workers' Compensation Law. [Doc. 26].

The plaintiff opposes the defendant's motion, arguing that genuine issues of material exist which preclude summary judgment. [Doc. 31].[1]

I.    **FACTUAL BACKGROUND**

The defendant National Seating manufactures seats for large trucks, such as Volvo, Kenworth, and Peterbilt at its facility in Vonore, Tennessee. [Krupp Aff. ¶ 3]. National Seating hired Gibson in 1985 as a sewer; she began working in the Assembly Department in February 1989. [Gibson Aff. ¶ 2]. While working on the assembly line, Gibson was responsible for placing cushions and DOT labels on truck seats. [Gibson Dep. at 46]. To place the cushions, Gibson had to insert the cushion, hammer two "pal nuts" into place to hold it in position, and install two plastic ties that prevented the cushion from separating. [Id. at 47-48]. Gibson's supervisor on the assembly line, Mike Bertram testified that Gibson was a hard worker, that her work product was good, that she got along well with others, and that she was punctual, pleasant, and devoted to her job. [Bertram Dep. at 34-35]. He never had to discipline her. [Id. at 35].

In April, 1998, Gibson fell down an embankment at National Seating during a gas leak evacuation and broke her left wrist. [Gibson Dep. at 29-30]. She made a worker's compensation claim that was ultimately settled in September, 1998, with medical payments left open. [Gibson Aff. ¶ 6]. In August, 2000, she had surgery on her left wrist and missed about two

---

[1]Following the hearing on the motion for summary judgment, the plaintiff filed a motion seeking leave to file a supplemental brief. [Doc. 37]. The defendant filed a response, opposing the motion. [Doc. 38]. The Court has reviewed the plaintiff's proposed supplemental brief and finds it to be largely a restatement of the plaintiff's arguments at the hearing. As the parties have already submitted exhaustive briefs and oral arguments on these issues, the plaintiff's Motion for Leave to File a Supplemental Brief [Doc. 37] is respectfully **DENIED**.

months of work as a result. [Gibson Dep. at 114].  She has had difficulty with her left wrist since

then. [Id. at 30].  She returned to her assembly line job in November, 2000. [Gibson Aff. ¶¶ 7-8].

However, she remained under restriction on the use of her left hand and worked using mostly her

right hand. [Gibson Dep. at 37-38, 115-16].

In November, 2001, Bertram approached Gibson about performing quality inspection

duties.  He indicated that National Seating was having some quality issues and that this move would

help the company. [Id. at 43-44].  Although the plaintiff had reservations about giving up her job

in assembly, she eventually agreed to the move. [Bertram Dep. at 42].  Gibson began inspecting all

seats on the Volvo line.  She would conduct a visual inspection, note any problems, and have the

appropriate assembly personnel fix the problem. [Gibson Dep. at 49-50].  To perform the visual

inspection, Gibson physically turned the seats while they were on the assembly line. [Id. at 50].  She

used her right hand about 75% of the time to turn the seats. [Id. at 37-38].  She also steamed

wrinkles out of the seats using a steam tool. [Id. at 50].

In April, 2002, Quality Manager Rodney Ammons informed Gibson that she was

being transferred to the Quality Department and that she would receive a 25 cents per hour raise. [Id.

at 55].  An "Employee Change of Status Report" (the "Report") dated April 1, 2002 reflects this

raise and further reflects that Gibson's job was transferred from "Truck Assembly" to "Quality

Inspector." [Doc. 26 Ex. 1].  The reason for this change is stated as: "Customer Demands (Job Bid)."

The Report is signed by both Gibson and Ammons. [Id.].  Despite the transfer of job title, the

department number on the Report indicates that Gibson remained in the Production Department.

[Whitley Dep. at 36].  The cost for her labor remained with the Production Department and was not

charged to the Quality Department. [Id. at 58].

Gibson continued to have restrictions. In October, 2002, Gibson's physician issued another set of restrictions. [Doc. 26 Ex. 2]. Under these restrictions, Gibson could not handle objects over five (5) pounds or use vibrating hand tools. [Id.]. Gibson understood, however, that these restrictions applied only to her left hand. [Gibson Dep. at 63-64]. In early 2003, Gibson's right back and shoulder began hurting. [Id. at 109]. She attributed this pain to having to reach across the assembly line, a length of approximately two feet, to get the steamer to steam the seats. [Id. at 42, 109]. She stopped steaming and underwent physical therapy, and the pain resolved. [Id. at 110]. No one complained or gave her any difficulty about her decision not to steam the seats any longer. [Id.].

Other employees at National Seating performed inspection duties. Quality Auditors performed random inspections as part of their normal job duties. [Id. at 66-67; Huett Dep. at 16-17; Whitley Dep. at 58-60]. In addition to random inspections, Quality Auditors tracked information on charts, processed information about work on the lines, and measured various items on the line. [Gibson Dep. at 67]. It is undisputed that Gibson was not a Quality Auditor and did not perform all of the duties of a Quality Auditor. [Id.].

National Seating does not have a written job description for the position of Quality Inspector. [Krupp Aff. ¶ 17; Whitley Dep. at 46]. It is the position of National Seating that the position of Quality Inspector, other than the position created for Gibson, did not exist. [Id.]. Before Gibson began working as a Quality Inspector, there was no employee at the facility who performed full-time inspection duties. [Heide Dep. at 21]. It is the position of National Seating that no one has held such a position since Gibson was terminated. [Heide Aff. ¶ 4; Krupp Aff. ¶ 16; Tallent Aff. ¶ 4].

4

Jeff Krupp became the Human Resources Manager at the Vonore plant in September, 2002. [Krupp Aff. ¶ 2]. In 2003, Krupp developed an "alternate duty" policy. It went into effect on September 25, 2003. [Krupp Dep. at 43]. Prior to Krupp developing this policy, there was no limit on the time an employee could be in an alternate duty position; as a result, employees sometimes would remain in such assignments for substantial periods of time, and management did not have a clear idea of how to handle such situations. [Krupp Aff. ¶ 6]. The "alternate duty" policy developed by Krupp limited employees to four months of service in an alternate duty position. [Id. ¶ 7; Doc. 26 Ex. 3]. Specifically, the policy states as follows:

> Associates who experience an injury or illness that is temporary in nature may be assigned to alternate duty work. The assignment of such work will be at the discretion of National Seating and shall not continue for more than four months.

[Doc. 26 Ex. 3]. At the time the policy was implemented, there were three employees that National Seating considered affected by this policy: Gibson, Teresa Kirkland, and Robin Rowe. [Krupp. Aff. ¶ 5]. All three women were in the protected age category and had job related medical problems that resulted in worker's compensation claims. [Krupp. Dep. at 52-55; Gibson Aff. ¶ 17].

On October 27, 2003, Gibson received a letter from Krupp, which stated, in pertinent part, as follows:

> On September 29, 2003, National Seating implemented a new "alternate duty work" policy under which an associate who experiences an injury or illness that is temporary in nature may be assigned work outside his or her normal job classification and/or responsibilities. The new policy further provides that the assignment of such work shall not continue for more than four months.
>
> As you know, more than one year ago, you were assigned to alternate duty work and, since that time you have not returned to your regular job. Obviously, the time that you have been assigned alternate duty work far exceeds the four-month period permitted in the new policy.

5

> Accordingly, the purpose of this letter is to apprise you of your status in light of the Company's implementation of this new policy.
>
> As an initial matter, National Seating must determine whether you can perform the duties and responsibilities of your regular job. To assist in this determination, I have enclosed a Request for Medical Information form on which your physician can provide the Company with guidance about whether you can perform the duties of your regular job . . . .
>
> Only after receiving the requested medical information from your doctor may National Seating determine whether you can return to your regular job duties. In the meantime, the Company will permit you to remain in your current alternate duty work assignment until November 30, 2003.

[Doc. 26 Ex. 4].

Gibson immediately confronted Krupp about the letter and told him that her job as a quality inspector had never been classified as light duty or an alternate job. [Gibson Dep. at 61]. Nevertheless, Gibson complied with National Seating's request and signed a medical consent form. [Doc. 26 Ex. 4]. She noted on the bottom of the form that Bertram had moved her from her regular job duties in assembly for the good of the company. [Id.]. Gibson's physician, Dr. Bell, provided the requested medical information, which confirmed the physical limitations that Gibson had with respect to lifting, repetitive hand movements, and the use of vibrating hand tools. [Doc. 26 Ex. 5].

In response to this information, Krupp provided Gibson with job descriptions for three open positions at the plant: MIG Welder, Robot Welder, and Assembly. [Gibson Dep. at 64]. All three positions required frequent lifting beyond Gibson's five-pound weight limit. [Doc. 26 Ex. 6]. Gibson does not know if she would have been qualified or able to perform either open welding position. [Gibson Dep. at 65]. With regard to Assembly, Gibson testified that she could have

6

performed her former duty of placing cushions on the seats, but she was aware that by December, 2003, the Assembly Department had changed, and that with some exceptions, employees rotated duties in Assembly and were not assigned to only one job duty. [Id. at 65, 140-41]. Gibson did not tell Krupp that she could have performed the duties of her former Assembly position. She testified that she "felt like he already knew that." [Id. at 66]. Instead, Gibson told Krupp that he knew her restrictions and that he should let her know "which one he decided on." [Id. at 64-65].

On December 9, 2003, Krupp met with Gibson in his office. [Id. at 70-71]. Krupp told Gibson that "there didn't seem to be any job for [her] in the plant and that [her] job was being eliminated." [Id. at 72]. Gibson testified that Krupp told her that she "had a disability and they were trying to find a job, something they could legally put [her] on." [Id. at 81]. Krupp denies that he called Gibson disabled. [Krupp. Dep. at 85]. Krupp then explained that the Company was eliminating the Quality Inspector position that she had been performing, and that the elimination was given as the reason for her discharge. [Gibson Dep. at 72, 83]. Gibson was 59 years old at the time of her termination.

The day after Gibson was terminated, Krupp sent Bertram an e-mail, which states, in pertinent part: "I just wanted to make sure we are on the same page. With the departure of Mildred Gibson, under no circumstances do we place an associate doing her old alternate duty job." [Doc. 31 Ex. E].

Gibson later received a "Separation Notice" from the State of Tennessee Department of Employment Security, on which Payroll Manager Janet Morris marked "Lack of Work" instead of "Discharge" as the stated reason for Gibson's termination. [Gibson Dep. at 137; Doc. 26 Ex. 7].

Morris states in an affidavit that this was done so that the State did not initially deny Gibson's claim for unemployment compensation. [Morris Aff. ¶ 7].

At the time of Gibson's discharge, National Seating was operating four assembly lines, all on first shift. [Stipes Aff. ¶ 3]. However, as business increased during 2004, National Seating added assembly lines and Quality Auditor positions. [Id. ¶ 4]. After Gibson's termination, the Quality Department "borrowed" other employees from other departments to do 100% inspection work. [Heide Dep. at 21]. For example, Betty Black was brought in from the Parts and Services Department and did full-time inspection work for approximately three to four weeks. [Black Dep. at 17; Heide Aff. ¶ 5]. Black was 46 years old at the time. [Black Dep. at 8]. Company records indicate that Black was assigned temporarily to the Quality Department as a Quality Auditor. [Doc. 31 Ex. F]. Black did not receive any training on inspection before she was transferred. [Black Dep. at 21]. Eventually, Black returned to Parts and Services, and the inspection work on the Kenworth/Peterbilt assembly line was taken over by Quality Auditor Wendi Huett. [Id. at 35-36].

National Seating hired Don Thomas to perform quality inspection duties in January, 2004. [Gibson Dep. at 74; Whitley Dep. at 55-56]. In addition to inspecting seats on the line, Thomas traveled to General Motors in Detroit on behalf of National Seating to assist with quality issues and requirements. [Heide Dep. at 21; Whitley Dep. at 55-56].

Since Ms. Gibson was terminated, the number of employees in the Quality Department have increased from eight to fifteen. [Krupp Dep. at 85]. The overall number of employees at National Seating has grown from about 400 in September, 2002 to about 500 employees at present. [Id. at 30].

In addition to the worker's compensation claim that Gibson made in connection with her broken wrist in 1998, Gibson made several other worker's compensation claims, which can be summarized as follows:

> September 25, 2001: Gibson developed pain in her left shoulder while putting cushions on the seat. National Seating provided her physical therapy and medication, and the pain resolved. [Gibson Dep. at 32-33; Doc. 26 Ex. 8].

> March 4, 2002: Gibson developed pain and numbness in her right hand while using the hand steamer. She received physical therapy, medication, and a splint, and the pain resolved. [Gibson Dep. at 38-39; Doc. 26 Ex. 9].

> May 25, 2002: Gibson developed pain and soreness in her neck and left shoulder while pulling and checking seats. Gibson does not remember filing this claim but does not deny having done so. [Gibson Dep. at 39; Doc. 26 Ex. 10].

> February 26, 2003: Gibson experienced pain in her right shoulder while reaching across the assembly line to steam a seat. She received some physical therapy, but the pain did not resolve. Eventually, she simply stopped steaming the seats. [Gibson Dep. at 41-42; Doc. 26 Ex. 11].

Gibson admits that Krupp never made any negative comment about her worker's compensation claims. [Gibson Dep. at 27]. She further admits that Bertram never said or did anything in particular that she related to her worker's compensation claims, although she alleges that on occasion she "would happen to look up and I would see Mr. Bertram watching me, you know. I don't know for what reason . . . ." [Id. at 28].

9

## II.     __THE SUMMARY JUDGMENT STANDARD__

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of establishing that there is no genuine issue of material fact lies upon the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

In considering a motion for summary judgment, the Court must take all of the evidence submitted by the non-moving party as true, and must draw all reasonable inference in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. Id. at 248, 106 S. Ct. at 2510. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. Id.

Once the moving party presents evidence sufficient to carry its burden under Rule 56, the non-moving party may not rest upon its pleadings, but must affirmatively set forth, by affidavits or otherwise, "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). An entry of summary judgment is mandated if, "after adequate time for discovery and upon motion, [the non-moving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552. In reviewing the evidence, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury

10

or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52, 106 S. Ct. at 2512.


## III.    ANALYSIS

### A.    Disability Discrimination

National Seating initially argues in its motion that Gibson cannot maintain a disability discrimination claim because (1) Gibson does not have an impairment that substantially limits a major life activity and (2) Gibson has asserted multiple reasons for her termination and therefore cannot prove that she was terminated solely due to her disability. While Gibson concedes that she does not have an impairment that substantially limits a major life activity, she contends that there is a genuine issue of material fact as to whether National Seating regarded her as disabled. Further, Gibson argues that her pursuit of relief in the alternative does not preclude her from pursuing a disability discrimination claim. In reply, National Seating argues that Gibson cannot show that National Seating perceived her to be disabled, and that even if she could establish a prima facie case, she cannot show that National Seating's stated reason for discharge is pretextual.

The ADA prohibits an employer from discriminating against a qualified individual with a disability because of that person's disability. 42 U.S.C. § 12112.[2] In order to establish a prima facie case of discrimination under the ADA, a plaintiff must prove: "(1) that she or he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation, and (3) who was discriminated against solely because of the

---

[2]The Tennessee Handicap Discrimination Act mirrors the ADA; accordingly, discussion of the same standard applies under both federal and state law. See Bower v. Federal Express Corp., 156 F. Supp. 2d 678, 689 (W.D. Tenn. 2001).

11

disability." Mahon v. Crowell, 295 F.3d 585, 589 (6th Cir. 2002). An individual is "disabled" under the ADA if she (1) has a physical or mental impairment that "substantially limits" one or more major life activities; (2) has "a record of such an impairment;" or (3) has been "regarded as having such an impairment." 42 U.S.C. § 12102(2). A person is considered to be "regarded as" disabled if (1) the person does not have an impairment but the employer mistakenly believes that the person has an impairment that substantially limits a major life activity or (2) the person has an actual, nonlimiting impairment but the employer mistakenly believes that the impairment substantially limits a major life activity. Sutton v. United Air Lines, Inc., 527 U.S. 471, 489, 119 S. Ct. 2149-50, 144 L. Ed. 2d 450 (1999); 29 C.F.R. § 1630.2(l). "Thus, an individual may fall into the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties." Ross v. Campbell Soup Co., 237 F.3d 701, 706 (6th Cir. 2001).

 To be regarded as substantially limited in the major life activity of working, an individual must be regarded as being precluded from a substantial class of jobs. Henderson v. Ardco, Inc., 247 F.3d 645, 650 (6th Cir. 2001); 29 C.F.R. § 1630.2(j)(3)(i) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major activity of working."). A "class of jobs" is defined as "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)(3)(ii)(B).

In the present case, Gibson contends that she had an actual, nonlimiting impairment that National Seating mistakenly believed substantially limited one or more major life activities. Gibson asserts that Krupp's statement to her that she had a disability and that he was trying to find a position that he could put her in "legally" constitutes direct evidence that National Seating regarded her as disabled.

National Seating denies that Krupp made such a statement and argues that, in any event, this statement attributed to Krupp fails to establish that National Seating believed that she was precluded from a substantial class of jobs and hence regarded her as disabled. National Seating contends that, at most, Krupp's alleged statement indicates that he was searching for a current open position that Gibson could perform within the restrictions set out by her physician.

The Court finds that there is sufficient evidence in the record to create a material factual dispute as to whether National Seating, in fact, regarded Gibson as disabled. Viewing, as the Court must, the facts in the light most favorable to the plaintiff and drawing all reasonable inferences in her favor, Krupp's alleged statements to Gibson prior to her termination constitute evidence that National Seating mistakenly believed that Gibson was unable to perform a substantial class of jobs due to her perceived disability. See Henderson, 247 F.3d at 654 ("Plaintiff has brought forward evidence that the defendant perceived there was no job for her at the . . . plant, and this gives an indication of the employer's perception about her suitability for a class of relevantly similar employment.").

Furthermore, the Court finds that there is sufficient evidence in the record to create a material factual dispute as to whether the reasons given for the plaintiff's termination were pretextual. See Moorer Baptist Mem'l Health Care Sys., 398 F.3d 469, 481 (6th Cir. 2005), reh'g

en banc denied April 15, 2005. The defendant's initial stated reason for terminating the plaintiff was that she was in an alternate duty position pursuant to the alternate duty policy. However, there is a factual dispute as to whether she was in fact in an alternate duty position at all at the time she was terminated. The alternate duty policy was not even created until almost two years after she had been transferred to the position of quality inspector. Gibson was never told that her position as a quality inspector was an alternate duty position, that it was due to her limitations or that there were any "production" issues with her work. Rather, Bertram told her that the company was having trouble with quality control and needed her help. Furthermore, the Change of Status Report completed in April, 2002 indicates that Gibson was transferred to the position of quality inspector due to "Customer Demands (Job Bid)." [Doc. 26 Ex. 1].

It is the plaintiff's testimony that she was able to perform the essential functions of her job on the assembly line at the time she went to full-time inspection, and that she could have returned to the assembly line in 2003. However, she was not given the opportunity to return to her prior position. Instead, Krupp allegedly told Gibson in December, 2003 that she was disabled and that the company was trying to find a position that it could put her in "legally." She was ultimately offered three open positions, which according to their descriptions, were all beyond the plaintiff's restrictions.[3] "[W]here there is substantial evidence that an individual's medical status played a significant role in an employer's decision to fire that individual, combined with evidence that the employer concocted a pretextual justification for that firing, the need for more extensive factual inquiry – i.e., by a trier of fact – into whether the employer engaged in unlawful discrimination is

_____

[3]In a supplemental affidavit, filed after the summary judgment hearing, Krupp testified that the physical requirements for these jobs have remained the same since September, 2002 to the present. [Second Krupp Aff. ¶ 3].

especially acute." <u>Moorer</u>, 398 F.3d at 481 (quoting in part <u>Ross</u>, 237 F.3d at 709) (quotation marks omitted).

The Court further finds that the plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether she was qualified to perform the job requirements with or without reasonable accommodation. There is evidence in the record to support a finding that Gibson was qualified to perform inspection work; that she was doing so without complaints from her or her employer; and that the defendant's need for full-time inspection work continued after she was terminated. Furthermore, Gibson testified that she was capable of returning to her prior assembly line position in 2003; however, she was not provided the option of returning to what the defendant referred to as her "regular job." Finally, there is a dispute as to which job was her "regular job" as of October, 2003, when she received the letter from Krupp.

There is also a question of fact as to whether the termination was pretextual, in that the initial stated reason was the alternate duty policy, but was later changed to the contention that her job was being eliminated. This alone might suffice to create a material factual dispute. However, when coupled with the evidence of continuing use of employees full-time for quality inspection and increases in personnel in the Quality Department, the material factual dispute is clear.

Based on the evidence presented, a jury could reasonably conclude that Gibson was discriminated against solely because of her perceived disability. Accordingly, summary judgment on this claim must be **DENIED**.

**B.      Age Discrimination**

The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  A plaintiff may meet her evidentiary burden under the ADEA in one of two ways.  Mitchell v. Vanderbilt University, 389 F.3d 177, 181 (6th Cir. 2004).  On the one hand, a plaintiff may offer direct evidence of the employer's discriminatory motive by producing "evidence, which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003) (quoting Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999)).  If, on the other hand, a plaintiff is unable to provide direct evidence of an improper motive, he may offer indirect and circumstantial evidence of such a motive pursuant to the burden-shifting approach established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

In order to establish a prima facie case of age discrimination using circumstantial evidence under the McDonnell Douglas framework, a plaintiff must show that: (1) she is a member of the protected class, that is, she is at least forty years of age; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the position; and (4) she was replaced by a younger person.[4]  Rowan v. Lockheed Martin Energy Systems, Inc., 360 F.3d 544, 547 (6th Cir. 2004), reh'g en banc denied May 10, 2004.  A person is not "replaced," however, "when another

---

[4]Claims brought under the THRA are governed by the same evidentiary framework that applies to ADEA claims.  Bruce v. Western Auto Supply Co., 669 S.W.2d 95, 97 (Tenn. Ct. App. 1984).

16

employee is assigned to perform the plaintiff's duties in addition to other duties or when the work is redistributed among other existing employees already performing related work." Barnes v. GenCorp., Inc., 896 F.2d 1457, 1465 (6th Cir. 1990).

In a reduction in force situation, the discharged employee is not replaced. Therefore, the fourth element which a plaintiff must show is some "direct, circumstantial or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." Skalka v. Fernald Environmental Restoration Mgmt. Corp., 178 F.3d 414, 420-21 (6th Cir. 1990) (quoting Barnes, 896 F.2d at 1465).

This burden does not change even if the plaintiff demonstrates that younger individuals were retained in other jobs which the plaintiff was qualified to perform. Barnes at 1465. "A different result would allow every person age 40-and-over to establish a prima facie case of age discrimination if he and she was discharged as part of a work force reduction." Id. In other words, the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of age. Id. at 1466. "Age itself must be the motivating factor behind the [discharge] for there to be a cognizable ADEA claim." Halloran v. Minnesota Old Northwest Agents, Ltd. Partnership, 58 F. Supp. 2d 831, 837 (W.D. Tenn. 1999).

Once the plaintiff has made out a prima facie case, the burden shifts to the defendant to give a legitimate, non-discriminatory reason for the termination, Rowan, 360 F.3d at 547. If the defendant satisfies this burden, the burden shifts back to the plaintiff to show that the legitimate reasons offered were merely pretext for a decision "actually motivated by an unlawful bias against age." Id. A plaintiff may satisfy this burden "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to

warrant the challenged conduct." Wexler, 317 F.3d at 576 (quoting Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000)).

The parties do not dispute, for the purposes of this motion, that the first three elements of the McDonnell Douglas test have been satisfied: Gibson was 59 at the time of her discharge and therefore a member of a protected class; she was qualified to perform quality inspections; and she suffered an adverse employment action. The parties strongly disagree, however, about the nature of her termination. The defendant contends that Gibson's termination was a reduction in force and therefore, Gibson is required to establish that she was singled out for termination due to her age. Gibson, on the other, contends that she was not the subject of a reduction in force, but rather was replaced by a younger worker.

"A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company." Barnes, 896 F.2d at 1465. The Court finds that there is a legitimate factual dispute as to whether a reduction in force in fact occurred in this case. The plaintiff was initially informed, both in writing and orally, that her job position was being changed due to the alternate duty policy and that she had exceeded the time limitations of that policy. Gibson was then allegedly told that she was disabled and that the company was trying to "legally" place her in a different position. Subsequently, she was told that her job position was being eliminated. Finally, her discharge notice stated the reason for her discharge was lack of work. There is also evidence in the record which could support a finding that other employees, including Don Thomas and Betty Black, were hired and/or reassigned to perform the plaintiff's duties, and that business considerations indicated a need for such duties to be performed full-time following her termination. Assuming that the plaintiff's termination was not

18

a result of a reduction in force, this evidence also satisfies the plaintiff's burden in establishing that she was replaced by a younger worker, as the record indicates that Betty Black was 46 years old.

Even assuming that the plaintiff's termination was a reduction in force, the plaintiff has presented sufficient evidence to create a factual dispute as to whether the plaintiff was singled out for termination due to her age. Only three employees were affected by the ex post facto alternate duty policy. All three of the affected employees were women in the protected age category. Such evidence, while admittedly thin on its own, could, when considered with the other evidence previously noted, create a reasonable inference to a jury that these employees were selected for termination, at least in part, due to their age. See Barnes, 896 F.2d at 1466. Thus, regardless of whether this was a legitimate reduction in force situation, the plaintiff has presented sufficient evidence to establish a prima facie case of discrimination.

Having found that the plaintiff has made out a prima facie case of discrimination, the burden shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the plaintiff's discharge. If that burden can be met, the plaintiff must then present evidence to demonstrate that the proffered reason is pretextual. Assuming that the defendant's proffered reason for the discharge, i.e., the implementation of the alternate duty policy, is legitimate, the Court finds, for the reasons previously set forth in this opinion, that the plaintiff has presented sufficient evidence to demonstrate pretext. Accordingly, the defendant's motion for summary judgment with respect to the plaintiff's age discrimination claim must be **DENIED**.

## C.    Worker's Compensation Retaliation

Finally, National Seating argues that Gibson cannot establish a prima facie case of retaliation based on her pursuit of worker's compensation benefits. [Doc. 26].  To establish a cause of action for discharge in retaliation for filing a worker's compensation claim, a plaintiff must establish the following elements:

> (1) The plaintiff was an employee of the defendant at the time of the injury; (2) the plaintiff made a claim against the defendant for workers' compensation benefits; (3) the defendant terminated the plaintiff's employment; and (4) the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate the employee's employment.

Anderson v. Standard Register Co., 857 S.W.2d 555, 558 (Tenn. 1993).  The burden is on the plaintiff to establish that her claim for worker's compensation benefits was a substantial factor in the decision to terminate her employment.  Morris v. Columbia Constr. Co., 109 S.W.3d 314, 317 (Tenn. Ct. App. 2003), perm. app. denied May 27, 2003.  To prove the "substantial factor" element, the plaintiff must introduce either "direct evidence of the necessary causal link" or produce "compelling circumstantial evidence of such a link."  Reed v. Alamo Rent-A-Car, Inc., 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999).

While Gibson does not dispute that National Seating had a right to implement the "alternate duty" policy, she argues that the manner and means by which the policy was applied to her provides compelling circumstantial evidence of retaliation. [Doc. 31].

The Court finds that Gibson has not produced any evidence from which a reasonable juror could conclude, short of sheer speculation, that her pursuit of worker's compensation benefits was a substantial factor in the decision to terminate her.  The fact that Gibson and the two other employees who were terminated as a result of the implementation of the "alternate duty" policy had

20

at some point previously made worker's compensation claims is not sufficient to establish a causal link between Gibson's pursuit of benefits and her termination. The plaintiff "cannot carry [her] burden by simply proving that [she] filed a worker's compensation claim that was followed by [her] termination. From these two facts standing alone, no inference of causation may be drawn." Morris, 109 S.W.3d at 317. Having failed to establish a causal connection between her pursuit of worker's compensation claims and her termination or to establish that her pursuit of worker's compensation claims was a substantial factor in her employer's motivation to terminate her, the Court finds that Gibson's claim for retaliation must fail. Accordingly, the defendant's motion [Doc. 25] will be **GRANTED** with respect to this claim.


IV.     <u>CONCLUSION</u>

        For the reasons set forth above, and based upon the entire record in this case, the defendant's Motion for Summary Judgment [Doc. 25] will be **GRANTED IN PART** and **DENIED IN PART**.

        **ORDER TO FOLLOW.**


                                        ENTER:


                                        __s/ C. Clifford Shirley, Jr.__
                                        United States Magistrate Judge